# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

JUDI ANN HINMAN,

       Plaintiff,

vs.                                    CASE NO. 3:10-cv-00912-J-TEM

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.
_____

## ORDER AND OPINION

This case is before the Court on Plaintiff's complaint (Doc. #1) seeking review of the final decision of the Commissioner of the Social Security Administration (the Commissioner) denying Plaintiff's claims for disability insurance benefits ("DIB") and supplemental security income ("SSI"). Plaintiff filed a legal memorandum in opposition to the Commissioner's decision (Doc. #20). Defendant filed a memorandum in support of the decision to deny disability benefits (Doc. #21). Both parties consented to the exercise of jurisdiction by a magistrate judge, and the case has been referred to the undersigned by the Order of Reference dated February 15, 2011 (Doc. #17). The Commissioner has filed the transcript of the underlying administrative proceedings and the record evidence (hereinafter referred to as "Tr." followed by the appropriate page number).

The undersigned has reviewed and given due consideration to the record in its entirety, including the parties' arguments presented in their briefs and the materials provided in the transcript of the underlying proceedings. Upon review of the record, the undersigned found the issues raised by Plaintiff were fully briefed, and determined oral

argument would not benefit the undersigned in making his determinations.

Accordingly, the instant matter has been decided on the written record.  For the reasons set out herein, **the Commissioner's decision is  REVERSED and the case is REMANDED** for additional proceedings.

## I.  Procedural History

Plaintiff protectively filed an application for a period of disability and disability insurance benefits on April 16, 2007 (Tr. 160-65), and an application for supplemental security income on March 26, 2007 (Tr. 167-69).  In both applications, Plaintiff alleged an onset date of February 14, 2007.  Plaintiff's application was denied initially on June 21, 2007, and upon reconsideration on November 29, 2007 (Tr.89-96).  Plaintiff requested an administrative hearing, which was held on August 11, 2009 in Daytona Beach, Florida (Tr. 35-88).  Administrative Law Judge ("ALJ") Stephen C. Calvarese issued a decision denying Plaintiff's claim on November 6, 2009 (Tr. 21-34).  Plaintiff filed a request for review, which the Appeals Council denied on August 4, 2010 (Tr. 1-3).  Plaintiff filed the instant action in federal court on October 5, 2010 (Doc. #1).

## II.  Summary of the ALJ's Decision

A plaintiff may be entitled to disability benefits under the Social Security Act if he or she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A). The  Commissioner  has  established  a  five-step  sequential  evaluation  process  for

determining whether a plaintiff is disabled and therefore entitled to benefits.[1]  *See* 20 C.F.R.

§§ 404.1520, 416.920[2]; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11ᵗʰ Cir. 1997).

In the instant case, the ALJ found Plaintiff met the Social Security Act's insured status requirements through March 31, 2012 (Tr. 26).  At step one of the sequential evaluation process, the ALJ found Plaintiff had not engaged in substantial gainful activity since February 14, 2007, the beginning of the time period under consideration.  *Id.*  At step two, the ALJ found Plaintiff suffered from the severe impairments of degenerative disc disease and hypertension.  *Id.*  Additionally, the ALJ noted Plaintiff's medically determinable mental impairments of dysthymia, generalized anxiety disorder, post traumatic stress disorder ("PTSD"), dysomnia, and emotional dysinhibition and memory impairment due to head trauma "do not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities and are therefore nonsevere."  *Id.*  At step three, the ALJ determined Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

---

[1] First, if a claimant is working at a substantial gainful activity, she is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled. 20 C.F.R. § 404.1520(f). A plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987).

[2] Unless otherwise specified, all references to 20 C.F.R. will be to the 2011 edition.  As the Regulations for SSI disability payments mirror those set forth for DIB on the matters presented in this case, from this point forward the Court may refer only to those sections in 20 C.F.R. pertaining to part 404 and disability insurance benefits.

Appendix 1 (Tr. 28).  At step four, the ALJ found Plaintiff had the residual functional capacity ("RFC")

> to lift/carry 20 pounds occasionally, 10 pounds frequently; sit, stand, or walk about 6 hours in an 8 hour workday; frequently climb ramps/stairs, balance, stoop, kneel, or crouch; occasionally crawl, or reach overhead; never climb ladders, ropes or scaffolds.  The claimant must avoid concentrated exposure to noise and hazards, including machinery and heights.  The claimant is limited to 20-30 minutes of computer work at one time.

(Tr. 28.)  With this RFC, the ALJ found Plaintiff was capable of performing her past relevant work as a sales assistant (Tr. 32).  Although Plaintiff was found capable of performing past relevant work, at step five the ALJ found there were other jobs existing in the national economy that Plaintiff could also perform, including ticket seller; school bus monitor; self serve store sales attendant; food and beverage order clerk; and laminator (Tr. 33).  Therefore, the ALJ found Plaintiff was not under a disability since February 14, 2007, the alleged onset date (Tr. 34).

## III.  STANDARD OF REVIEW

The scope of this Court's review is generally limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence.  *See also Richardson v. Perales*, 402 U.S. 389, 390 (1971).

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as more than a scintilla—*i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept

as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982)).

Where the Commissioner's decision is supported by substantial evidence, the Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560.

The Commissioner must apply the correct law and demonstrate that he has done so.  While the Court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions.  *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).  Therefore, in determining whether the Commissioner's decision is supported by substantial evidence, the reviewing court must not re-weigh the evidence, but must determine whether the record, as a whole, contains sufficient evidence to permit a reasonable mind to conclude that the plaintiff is not disabled.  *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

As in all Social Security disability cases, a plaintiff bears the ultimate burden of proving disability, and is responsible for furnishing or identifying medical and other evidence regarding his or her impairments.  *Bowen*, 482 U.S. at 146 n.5; *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991); *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987); 42 U.S.C. § 423(d)(5) ("An individual shall not be considered to be under a disability unless

he [or she] furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.").  It is a plaintiff's burden to provide the relevant medical and other evidence that he or she believes will prove disabling physical or mental functional limitations.  20 C.F.R. § 404.704.

### IV.  Whether the ALJ Properly Evaluated Plaintiff's Mental Impairments

Plaintiff argues the ALJ erred by failing to include any mental limitations, as identified by Dr. William Winters and Dr. Elek Ludvigh, in the RFC or the hypothetical question posed to the vocational expert.  Plaintiff argues the ALJ's conclusion that she had no mental limitations that limit her ability to sustain employment is not supported by substantial evidence.

### A.    Medical Evidence Related to Plaintiff's Mental Impairments

Dr. Elek Ludvigh, a clinical psychologist, examined Plaintiff on October 23, 2007 (Tr. 482-88).  Plaintiff presented as well dressed and groomed, alert, cooperative, and made a good overall impression; however, she was also verbally pressured, physically tense, manifested nervous laughter, was periodically tearful, and gave the impression of being quietly agitated (Tr. 483).  Plaintiff reported she had been in an automobile accident when she was twenty-years-old and lost her sense of smell, experienced increased short term memory difficulties, and became more emotional following her injury.  *Id.*  Plaintiff also reported she had suffered another head injury in 2004 while riding a motor scooter, and stated her memory problems and emotional over-arousal were noticeably greater since the second head injury.[3]  *Id.*  Plaintiff reported she was raped at gunpoint when she was

_____

[3] Plaintiff was admitted to Broward General Medical Center in Fort Lauderdale, Florida on November 28, 2004 after sustaining injuries in a motor scooter accident the previous day
(continued...)

twenty-four-years-old and developed post traumatic stress disorder ("PTSD") following the trauma. *Id.* Plaintiff reported she received psychotherapy for her PTSD and the symptoms dissipated. *Id.* However, Plaintiff reported her PTSD symptoms returned after her second head injury. *Id.*

Dr. Ludvigh's examination consisted of five tests[4] and a one hour interview. Plaintiff's IQ tests indicated a score of 112 for Verbal IQ, 92 for Performance IQ, and 103 for Full Scale IQ (Tr. 484). However, Dr. Ludvigh stated that although those scores were included for reporting purposes, the Verbal Comprehension Index, Perceptual Organization Index, and Working Memory Index scores were "actually more illustrative" of Plaintiff's cognitive skills and deficits. *Id.* These tests revealed the following: reasoning and problem solving abilities involving language and abstract ideas (Verbal Comprehension Index) within the 86th percentile (High Average range); reasoning and problem solving abilities involving concrete objects and visual-spatial relationships (Perceptual Organization Index Score) at the 53rd percentile (Average range); and numeric processing and memory work abilities

---

[3](...continued)
(Tr. 379). At the time of admittance, an evaluation of Plaintiff revealed a secondary to C-1 fracture, Jefferson variant fracture, left temporal lobe contusion, and swelling of the scalp (Tr. 379, 382). Lab tests conducted on Plaintiff revealed trace free fluid in the pelvis, and a CT scan showed a right parietal skull fracture with pneumocephalus, left temporal hematoma, and subdural hematoma along the tentorium (Tr. 379). A CT head scan was performed on Plaintiff on December 7, 2004 by Dr. Richard Stiles (Tr. 290). The CT revealed Plaintiff's brain had a normal appearance, with no signs of infarction or bleeding; no mass effect or midline shift was identified, no extra-axial masses or fluid collections were seen; the ventricles were a normal size; and no abnormalities were seen in the posterior fossa, skull, paranasal sinuses, or mastoid air cells. *Id.*

[4] The tests administered were: (1) the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III); (2) the Kaufman Test of Educational Achievement-Second Edition; (3) the Bender Visual-Motor Gestalt Test; (4) the Temperament Type Research Instrument; and (5) the Incomplete Sentences Form (Tr. 482).

(Working Memory Index Score) at the 25th percentile (bottom of the Average range) (Tr. 485). Dr. Ludvigh attributed the reduced memory functioning and resulting 25th percentile score primarily to Plaintiff's head injuries. *Id.* Dr. Ludvigh elaborated that Plaintiff functioned at or above the High Average range of intellectual ability before she sustained her head injuries, and although she still retains good knowledge and skills, she is "significantly less proficient when working with visual-spatial relationships" and "noticeably impaired when attempting to manipulate information in memory." *Id.* Additionally, Plaintiff's loss of her sense of smell following her head injury typically indicates the presence of a "very significant injury in the pre-frontal cortex." *Id.* Damage in the pre-frontal cortex can cause increased emotional reactivity and increased difficulty in performing tasks that require "an individual to pay simultaneous attention to multiple sources of information." *Id.* Dr. Ludvigh acknowledged that "real world" tasks generally involve a substantial degree of "multi-tasking," and Plaintiff "probably does experience a greater degree of functional impairment than is necessarily obvious for her current test scores." *Id.* Dr. Ludvigh noted Plaintiff generally had good cognitive capabilities and stated she was "expected to be intellectually capable of maintaining responsible employment" (Tr. 485). Additional tests showed Plaintiff to have a twelfth grade equivalent in reading and an eighth grade equivalent in mathematics (Tr. 486). Dr. Ludvigh found Plaintiff did not a specific learning disability, but noted her "relatively mild memory problems and her increased emotionality will impair her ability to quickly and efficiently acquire new information and job skills." *Id.*

Dr. Ludvigh stated Plaintiff experienced a "relatively mild degree of impairment in her memory functioning, attentional skills, and in her ability to moderate her emotional responses, due to her multiple head injuries." *Id.* Cognitive tasks would require more effort

for her, but she appeared "to still be capable of responsible employment." *Id.* However, Dr. Ludvigh's personality assessment determined Plaintiff's head injuries caused her to become more easily emotionally aroused, and he concluded she "is probably more impaired by the increased emotionality she experiences as a result of her head injuries." *Id.* Dr. Ludvigh found Plaintiff is "more likely to 'act out' her distress" when she becomes emotionally aroused. *Id.* Dr. Ludvigh stated such an impairment is mild when standing alone, however Plaintiff's "numerous serious life stressors which would tax any person's emotional coping abilities" increased the severity of this impairment. *Id.* Dr. Ludvigh also noted Plaintiff was experiencing high levels of anxiety and chronic depression, which were "primarily psychological reactions to the many negative life changes she has experience," and her thought processes were marked by periodic confusion, distractability, and difficulty concentrating (Tr. 487). Dr. Lucvigh found such impairments caused Plaintiff to become blocked, withdrawn, and unproductive. *Id.* Dr. Ludvigh noted even "relatively mild stressors" were capable of precipitating an emotional crisis, and Plaintiff's "ability to consider and engage in productive activity is significantly reduced." *Id.* Dr. Ludvigh noted "[c]hanges in routine, unexpected events, and contradictory information generate great stress," and when Plaintiff believes such events are impending she becomes "emotionally over-reactive, and is likely to be tearful, despairing, anxious, and agitated." *Id.* Dr. Ludvigh diagnosed Plaintiff with emotional disinhibition and memory impairment due to head trauma, post-traumatic stress disorder, generalized anxiety disorder, and late onset dysthymia. *Id.*

On the final page of his report, in a section titled "Statement of Psychological Limitations Affecting Employment," Dr. Ludvigh noted Plaintiff had several employment

limitations (Tr. 488). First, chronic depression was noted as a limitation that would cause feelings of hopelessness, slowed physical performance, and heightened distractability. *Id.* These feelings would cause Plaintiff to have difficulty in effectively focusing on work activities, and her mind would tend to wander to critical, suspicious, anxious or other depressive thoughts. *Id.* This will cause her to appear distracted, temperamental, moody, and/or unconcerned with many basic life and vocational activities. *Id.* Second, generalized anxiety disorder – characterized by chronic tension, reduced concentration, increased fatigue, insomnia, and difficulty relaxing – would cause feelings of discouragement, emotional negativity, irritability, reduced self-esteem, heightened distractability, and an exacerbation of Plaintiff's medical problems. *Id.* This would exacerbate Plaintiff's concentration, attention, and increased emotionality issues. *Id.* Finally, Plaintiff's multiple head injuries caused "significant impairment" in her ability to quickly store and manipulate information from memory, simultaneously attend to multiple sources of information, and appropriately control her emotional responses. *Id.*

At the end of his evaluation, Dr. Ludvigh recommended Plaintiff be referred for psychiatric evaluation to determine the appropriate medication and course of treatment for her chronic depression and anxiety. *Id.* Psychotherapy was "highly" recommended to help Plaintiff cope with her depression, anxiety, and PTSD. *Id.* Dr. Ludvigh explained he was highly recommending psychotherapy for these conditions because of "the extent to which these conditions impair [Plaintiff's] ability to obtain employment or further benefit  benefit from the rehabilitation process." *Id.*

Dr. Ludvigh referred Plaintiff to Dr. Winters for treatment for  "depression and anxiety" (Tr. 477). Plaintiff initially met with Dr. Winters on December 18, 2007. *Id.*

Plaintiff reported she had poor appetite, weight loss, too little sleep, was withdrawing from activities, experienced hopelessness, and her chronic self-esteem problems were worsening. *Id.* Dr. Winters noted Plaintiff presented as depressed, with cooperative and appreciative behavior (Tr. 480). Plaintiff had clear speech, a zero out of three word recall, and noted difficulty when discussing dates and other historical facts. *Id.* Plaintiff's content of thought was "non-psychotic with no delusions elicited," and she denied hallucinations or suicidal/homicidal ideation. *Id.* Dr. Winters stated Plaintiff's judgment was "questionable" and her insight was "marginal" because she had not sought further treatment for her apparent chronic depression and anxiety. *Id.* Dr. Winters relayed the following vegetative concerns related to Plaintiff 's psychiatric illness: poor appetite and sleep with depression and anxiety symptoms, and poor concentration with memory difficulties. *Id.* Plaintiff was assigned a Global Assessment Functioning ("GAF") score of 50.[5] *Id.* Concurring with Dr. Ludvigh, Dr. Winters noted Plaintiff would be a good candidate for treatment of depression, anxiety, and PTSD, and she would benefit from therapy. *Id.* Dr. Winters diagnosed Plaintiff with dysthymia, generalized anxiety disorder, PTSD, dysomnia, and emotional dysinhibition and memory impairment due to head trauma. *Id.* Dr. Winters noted Plaintiff had psychosocial environmental problems, severe inadequate social support, poor coping, and financial problems. *Id.* Dr. Winters prescribed Remeron and Wellbutrin and told Plaintiff to follow up in two weeks (Tr. 481).

---

[5] A GAF score of 50 is defined as "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed.).

On January 2, 2008, Plaintiff followed up with Dr. Winters and reported she could not tolerate the Wellbutrin because it was causing headaches (Tr. 476). Dr. Winters discontinued the Wellbutrin and increased her dosage of Remeron. *Id.* Thereafter, Plaintiff met with Dr. Winters monthly through June 2008, and often reported difficulty sleeping, mood swings, and depression (Tr. 467-75).

On January 30, 2008, Plaintiff's behavior was noted to be "edgy" and her thoughts were rapid (Tr. 475). Dr. Winters noted her mood was improved, but her anxiety levels persisted. *Id.* Plaintiff reported she had "huge mood swings" and her pain and irritability made her unable to work. *Id.* Dr. Winters increased Plaintiff's dosage of Remeron. *Id.* On February 28, 2008, Dr. Winters noted Plaintiff was mildly anxious and her mood was generally improved (Tr. 474). He noted her thought process was more positive than it was previously, but she continued to have "some negative themes overall." *Id.* Dr. Winters noted Plaintiff was showing improvement and was having a positive response to medications. *Id.* He noted her anxiety seemed better and she was less depressed, although she continued to have "some reactive depressive issues associated with negative environmental circumstances around her home." *Id.*

On March 23, 2008, Dr. Winters reported Plaintiff's mood continued to be "up and down" and she had a range of affect (Tr. 473). Dr. Winters stated Plaintiff appeared to be tolerating this regime "with marginal improvement." *Id.* Plaintiff expressed a desire to start work with a trial of 15-20 hours per week, and stated she had tried full time work but was unable to tolerate it. *Id.* Dr. Winters continued Plaintiff on Remeron and added Trazodone. *Id.* On May 21, 2008, Plaintiff reported she was looking for a job (Tr. 472). Dr. Winters noted her mood seemed lower, which he attributed to her relationship with her mother and

noted she was "in a dependent situation that is not supportive." *Id.* Dr. Winters discontinued Remeron, and prescribed Desyrel, Pristiq, and Restoril. *Id.* Dr. Winters requested Plaintiff follow up in two weeks for reevaluation. *Id.*

On June 4, 2008, Plaintiff reported her activity level had improved a little bit (Tr. 470). Dr. Winters noted her mood was still depressed and worried, although Plaintiff reported she through the Pristiq was helping her depression. *Id.* However, Dr. Winters discontinued Plaintiff's medication due to a possible allergic reaction after he noted she presented with facial edema and puffiness in her hands and lower extremities. *Id.* On June 11, 2008, Dr. Winters noted Plaintiff's mood was low, her affect was worried and anxious, and her thought process was congruent but somewhat confused (Tr. 468). Dr. Winters noted he would keep Plaintiff off her medications until she completed her antibiotics and medical work up. *Id.* He stated his plan was to follow up with her in July to get her back on medications "with the intent of getting her back to work as soon as her health and mental status are suitable for that purpose." (Tr. 468-69, 472).

On June 24, 2008, Plaintiff reported her mood had improved, although she continued to have difficult sleeping (Tr. 467). Dr. Winters noted she had been off her medications for three weeks. *Id.* They talked about restarting some medications and "targeting some of the symptoms she is experiencing." *Id.* Dr. Winters noted Plaintiff's mood seemed to be better and Plaintiff reported she was planning on getting back to work "as soon as she feels a little better." *Id.* Dr. Winters prescribed Trazodone and requested Plaintiff follow up in one month for reevaluation. *Id.*

On July 23, 2009, Plaintiff presented to Dr. Baldassarri crying, and complaining of increased stress, anxiety, insomnia, and depression (Tr. 526). Plaintiff reported she was

going through a "serious family situation" and she had broken up with her boyfriend. *Id.* She reported she was living with her mother who was not treating her well. *Id.* She denied suicidal thoughts. *Id.* Dr. Baldassarri assessed uncontrolled hypertension and depression/anxiety-situational related, and prescribed Paxil and Xanax. *Id.*

**B.    The ALJ's Finding that Plaintiff's Mental Impairments are Not Severe**

In the instant case, the ALJ found Plaintiff's medically determinable mental impairments of dysthymia, generalized anxiety disorder, post traumatic stress disorder, dysomnia, and emotional dysinhibition and memory impairment due to head trauma "do not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities and are therefore nonsevere" (Tr. 26). The ALJ considered the four broad functional areas, known as the "paragraph B" criteria, set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (Tr. 27). The ALJ found Plaintiff had no limitation in activities of daily living and social functioning; mild limitations in concentration, persistence or pace; and no episodes of decompensation of extended duration (Tr. 27-28).

In making this determination, the ALJ referred to the evaluation by Dr. Elek Ludvigh, treatment notes from Dr. William Winters and Dr. Geraldo Baldassarri, and the reports of two non-examining state agency physicians (Tr. 27). The ALJ stated he gave "no weight" to the conclusions of the non-examining state agency physicians, because their assessments were performed prior to Plaintiff's evaluation and "short term treatment" with Dr. Winters. *Id.* The ALJ concluded Plaintiff's mental impairment was not severe "based on the lack of any ongoing formal mental health treatment, the lack of evidence of consistent or ongoing use of psychotropic medications and the findings of examining

14

physicians which found no signs or symptoms consistent with a severe mental impairment other than a single accounting of a situational response." *Id.*

At step two of the disability analysis, the ALJ must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe." An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.1520(c). The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." *Bowen v. Yuckert,* 482 U.S. 137, 142, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)). Basic work activities include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, and handling, as well as capacities for seeing, hearing, and speaking; understanding, remembering and carrying out simple instructions; responding appropriately to supervisors and fellow employees and dealing with changes in the work setting; and the use of judgment. *Id.* "An impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, regardless of age, education, or work experience." *Bridges v. Bowen,* 815 F.2d 622,625 (11th Cir. 1987).

When determining whether a mental impairment is severe, the ALJ must consider the effect of the mental impairment on four broad functional areas, also known as "paragraph B" criteria, set out in the regulations for evaluating mental disorders. 20 C.F.R. Pt. 404, Subpart P, App. 1. Evaluating mental impairments in each of four functional areas will reveal the extent to which the impairments interfere with the claimant's ability to function "independently, appropriately, effectively, and on a sustained basis. 20 C.F.R. §

404.1520a(c)(2). The four broad functional areas are: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(4). When rating the degree of limitation in the first three categories, the ALJ will use a five-point scale: none, mild, moderate, marked, and extreme. *Id.* When rating the degree of limitation in the fourth category, the ALJ will use a four-point scale: none, one or two, three, and four or more. *Id.* If the limitation in the first three function areas rates at "none" or "mild," and the fourth area rates at a "none," then the ALJ will generally conclude that the claimants impairments are not severe, unless "the evidence otherwise indicates that there is more than a minimal limitation in ability to do basic work activities." 20 C.F.R. § 404.1520a(d)(1).

Upon review and consideration of the ALJ's decision and the record evidence, the Court finds the ALJ erred in weighing the opinion evidence related to Plaintiff's alleged mental impairments, and the reasons provided by the ALJ for finding Plaintiff's mental impairment not severe are not supported by substantial evidence.

An ALJ must consider and evaluate every medical opinion received. 20 C.F.R. § 404.1527 ("Regardless of its source, we will evaluate every medical opinion we receive."). The ALJ must base his RFC assessment on "*all* of the relevant evidence in the case record." SSR 96-8p, 1996 WL 374184, at *5 (S.S.A. 1996) (emphasis in original); *see also Nguyen v. Chater*, 172 F.3d 31, 34 (1st Cir. 1999) (holding an ALJ must base his RFC assessment on all relevant evidence including observations of treating physicians and others, medical records, and the description of the claimant's limitations). Social Security Ruling 96-8p further provides, "The adjudicator must consider all allegations of physical and mental limitations or restrictions." 1996 WL 374184, at *5.

In *Winschel v. Commissioner of Social Security,* 631 F.3d 1176 (11th Cir. 2011), the Eleventh Circuit held that whenever a physician offers a statement reflecting judgments about the nature and severity of a claimant's impairments, including symptoms, diagnosis, and prognosis, what the claimant can still do despite his or her impairments, and the claimant's physical and mental restrictions, the statement is an opinion requiring the ALJ to state with particularity the weight given to it and the reasons therefor. *Id.* at 1179 (citing 20 C.F.R. §§ 404.1527(a)(2), 416.927(a) (2); *Sharfarz v. Bowen,* 825 F.2d 278, 279 (11th Cir.1987)). Thus, while it is true the determination of disability under the Social Security Act is reserved to the Commissioner, the ALJ is nevertheless required to consider and explain the weight given to opinions of medical doctors, including examining consulting physicians. *See McCloud v. Barnhart*, 166 Fed. Appx. 410, 419 (11th Cir. 2006) (remanding where ALJ did not explain weight given to consulting psychologist's report or the reasons for discrediting his opinion); *Kline-Parris v. Astrue,* No. 1:10-cv-111-MP-GRJ, 2011 WL 4375047, at *13-14 (N.D. Fla. Aug. 18, 2011) (holding ALJ erred by ignoring and failing to discuss opinion of non-examining consulting physician).

In the instant case, the ALJ stated he gave "no weight" to the conclusions of the non-examining state agency physicians. However, he failed to state with particularity the weight given to the medical opinion provided by the examining physician, Dr. Ludvigh. Dr. Ludvigh's report constitutes as a medical opinion, because it contained statements reflecting judgments about the nature and severity of Plaintiff's impairments, including symptoms, diagnosis, and prognosis, what Plaintiff can still do despite her impairments, and her mental restrictions. *See Winschel,* 631 F.3d at 1179; 20 C.F.R. §§ 404.1527(a)(2).

Thus, the ALJ was required to "state with particularity" the weight given to Dr. Ludvigh's opinion. *Sharfarz*, 825 F.2d at 279. His failure to do so was error.

In very limited circumstances, the failure of an ALJ to state the weight given to the medical opinion evidence from a physician may be harmless error. *See Caldwell v. Barnhart,* 261 Fed.Appx. 188, 191 (11th Cir. 2008) (holding ALJ's failure to discuss weight given to examining physician constituted harmless error where limitations assessed by physician would not affect plaintiff's ability to perform job cited by VE; ALJ's failure to discuss weight given to examining psychologist constituted harmless error where opinion did not contradict the ALJ's finding and was substantially similar to that of another doctor whose opinion was given substantial weight); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535-36 (6th Cir. 2001) (holding ALJ's failure to discuss a physician's opinion constituted harmless error where the ALJ had attributed limitations of the claimant that were consistent with the doctor's opinion). In this instance, however, the weight afforded the medical opinions could very well make a difference in Plaintiff's assessed RFC.[6]

Moreover, not only did the ALJ fail to state with particularity the weight given to Dr. Ludvigh's opinion, he also ignored and failed to discuss important aspects of the examining psychologist's opinion regarding Plaintiff's functional limitations. The ALJ's conclusions suggest that those aspects were not considered. *See Winschel,* 631 F.3d at 1179. A reviewing court "cannot properly find that [an] administrative decision is supported by substantial evidence" when the ALJ reached his or her conclusion "by focusing upon one aspect of the evidence and ignoring other parts of the record." *McCruter v. Bowen*, 791

---

[6] The Eleventh Circuit has noted that the focus of any RFC assessment is on the doctors' evaluations of a claimant's condition and the resulting medical consequences. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

F.2d 1544, 1548 ( 11th Cir. 1986).  "It is not enough to discover a piece of evidence which supports that decision, but to disregard other contrary evidence."  *Id.; see also Rogers v. Astrue*, No. 3:10-cv-352-J-TEM, 2011 WL 4346567, at * 8 ( M.D. Fla. Sept. 16, 2011) ("[A]n ALJ cannot pick and choose from the evidence in order to support his or her conclusions."); *Evans v. Astrue*, No. 309-101, 2011 WL 1636920, at *7 (S.D. Ga. Mar. 29, 2011) (finding error where ALJ relied on parts of consulting physician's report "that supported his decision while ignoring the parts that conflicted with it").

The ALJ noted Dr. Ludvigh's evaluation and recounted Plaintiff's Verbal IQ, Performance IQ, and Full Scale IQ scores (Tr. 27).  The ALJ then recounted Dr. Ludvigh's statement that Plaintiff had "good cognitive abilities" and was "expected to be capable of maintaining responsible employment."  *Id.*  The ALJ further stated Plaintiff was noted to only have "mild problems" in her memory functioning, attentional skills, and in her ability to moderate emotional responses, and was referred for psychiatric evaluation.  *Id.*

The ALJ thus appeared to place some emphasis on Plaintiff's IQ scores, despite Dr. Ludvigh's caution that the WAIS-III Verbal and Performance tests were "actually more illustrative" of Plaintiff's cognitive skills and deficits (Tr. 484).  Dr. Ludvigh noted even the WAIS-III scores did not entirely capture the degree Plaintiff's functional impairment, because most real-world tasks involve substantial multi-tasking (Tr. 485).  Additionally, the ALJ's statement that Dr. Ludvigh found "only mild problems in her memory functioning, attentional skills, and in her ability to moderate emotional responses" is not an entirely accurate summary of Dr. Ludvigh's opinion.  Dr. Ludvigh provided very specific limitations regarding Plaintiff's ability to perform basic work functions that the ALJ failed to address in a meaningful way.  Dr. Ludvigh found Plaintiff was "significantly less proficient when

19

working with visual-spatial relationships" and "noticeably impaired when attempting to manipulate information in memory." *Id.* Plaintiff's multiple head injuries caused "significant impairment" in her ability to quickly store and manipulate information from memory, simultaneously attend to multiple sources of information, and appropriately control her emotional responses (Tr. 488). Furthermore, Dr. Ludvigh noted even "relatively mild stressors" were capable of precipitating an emotional crisis, and "[c]hanges in routine, unexpected events, and contradictory information generate great stress" which would significantly reduce Plaintiff's ability to engage in productive activity. These findings tend to contradict the ALJ's conclusion that Plaintiff has "no limitations" in social functioning.

Accordingly, the Court finds the ALJ failed to properly evaluate Dr. Ludvigh's medical opinion, and as such, the ALJ's decision is not supported by substantial evidence. As it is impossible for the Court to tell if the ALJ properly considered and weighed all the evidence in the record, this case must be remanded. *See Lawton v. Comm'r of Soc. Sec.*, 431 Fed. Appx. 830, 835 (11th Cir. 2011) (internal citations and quotations omitted) ("Although the ALJ is not required to specifically refer to every piece of evidence in the record, he is required to explain the weight he afforded to obviously probative exhibits."); *Owens v. Heckler*, 748 F.2d 1511, 1515-17 (11th Cir. 1984) (declining to affirm an ALJ's decision where it was unclear what test the ALJ used in reaching his conclusions and concluding it was not proper to affirm simply because some rationale might have supported the ALJ's conclusions). In making this determination, the Court has declined, as it must, to re-weigh the evidence in search of support for the ALJ's decision. *Bloodsworth*, 703 F.2d at 1239. On remand, the ALJ should specify the weight accorded to the opinion evidence, including any examining physicians, such as Dr. Ludvigh, and clearly articulate his reasons for

accepting or rejecting those opinions. Upon reconsideration of all medical opinions found in the record, the ALJ shall reassess Plaintiff's residual functional capacity.

As recounted previously, the ALJ concluded Plaintiff's mental impairments were not severe "based on the lack of any ongoing formal mental health treatment, the lack of evidence of consistent or ongoing use of psychotropic medications and the findings of examining physicians which found no signs or symptoms consistent with a severe mental impairment other than a single accounting of a situational response" (Tr. 27). Additionally, the ALJ found Plaintiff had no limitation in activities of daily living and social functioning, mild limitations in concentration, persistence or pace, and no episodes of decompensation of extended duration (Tr. 27-28). For the reasons discussed below, and in addition to the ALJ's failure to properly weigh the opinion evidence, the undersigned finds the ALJ's conclusions are not supported by substantial evidence and misrepresent or ignore relevant medical evidence.

First, contrary to the ALJ's conclusion, the record does reflect Plaintiff received formal mental health treatment. While the medical evidence in the record regarding Plaintiff's mental health is not substantially extensive, it nonetheless reflects Plaintiff received formal, consistent mental health treatment for a period of six months, during which she saw Dr. Winters nine times.

Second, the record also reflects an ongoing and consistent use of psychotropic medications during that six-month time period. During her treatment with Dr. Winters Plaintiff was prescribed several medications in an effort to find an appropriate dosage and type to minimize side effects. Plaintiff went off her medications at Dr. Winters' request due

to a possible allergic reaction, but was prescribed Trazodone again when she completed her antibiotics.  Thus, the record does not reflect a complete absence of formal mental health treatment or use of medication as indicated by the ALJ.

Third, examining physicians, notably Dr. Ludvigh and Dr. Winters as detailed above, reported signs and symptoms that reflected more than just a "single accounting of a situational response" (Tr. 27).[7]  Dr. Ludvigh attributed Plaintiff's mental impairments to her head injuries and her "numerous serious life stressors which would tax any person's emotional coping abilities," including "chronic physical pain, decreased physical capabilities, a relatively recent divorce, bankruptcy, difficulty maintaining employment, and the stress of living with her mother again" (Tr. 486).  Dr. Winters' notes reflect Plaintiff's ongoing problems with her living situation and poor relationship with her mother, financial difficulties, and preoccupation with pain (Tr. 467-481).  These reports suggest Plaintiff's mental impairments were the result of more than just "a single accounting of a situational response."

Fourth, as noted previously, the ALJ found Plaintiff experiences no limitations in social functioning without further elaboration.[8]  However, both Dr. Ludvigh's opinion and Dr. Winters' treatment notes contain evidence that contradicts this finding.  For example, Dr. Winters' notes reflect his impression that Plaintiff experienced psychosocial and

_____

[7] Although it is not clear, the ALJ appears to be referring to Dr. Baldassarri's July 23, 2009 report that Plaintiff was experiencing increasing anxiety, stress, insomnia, and depression after breaking up with her boyfriend and living with her mother (Tr. 526).

[8] Social functioning refers to the claimant's "capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals" and includes the ability to get along with others, such as family members."  20 CFR Pt. 404, Subpt. P, App. 1.

environmental problems due to "severe inadequate social support, poor coping, and financial problems" (Tr. 480). Dr. Ludvigh noted even "relatively mild stressors" were capable of precipitating emotional crises and Plaintiff's head injury made it difficult for her to control her emotional responses and made her more susceptible to moodiness and irritability (Tr. 487-88). Dr. Ludvigh noted Plaintiff withdraws from normal social activities during her depressive episodes (Tr. 488).

In light of this contradictory evidence, and without the ALJ providing the basis for his determination that Plaintiff had no limitations in the area of social functioning, this Court is unable to determine whether substantial evidence supports the ALJ's conclusion that Plaintiff's reported mental impairments do not more than minimally limit her ability to work. *Bridges,* 815 F.2d at 625; 20 C.F.R. § 404.1520a(d)(1). Accordingly, the undersigned finds this case must be remanded for additional proceedings.[9]

---

[9] In light of the errors identified above, the Court need not resolve the appropriateness of the ALJ's hypothetical to the VE. Of course, on remand, Plaintiff's claims must be evaluated in compliance with the applicable regulations and case law in all aspects. For example, the underlying assumptions of hypothetical questions must accurately and comprehensively reflect the claimant's characteristics, and a reviewing court must determine whether they are supported by substantial evidence. *McSwain v. Bowen.* 814 F.2d 617, 620-21 (11th Cir. 1987) (*per curiam*); *Pendley v. Heckler,* 767 F.2d 1561, 1562–63 (11th Cir. 1985) (*per curiam*); *see also Jones v. Apfel,* 190 F.3d 1224, 1229 (11th Cir. 1999) ("In order for a VE's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments.").

**V. Whether the ALJ Erred in Failing to Obtain an Updated Assessment from Dr. Baldassarri or to Order A Consultative Examination Based on Plaintiff's Declining Physical Condition**

Plaintiff argues the ALJ erred by failing to obtain an updated assessment of Plaintiff's functioning from Dr. Geraldo Baldassarri, or in the alternative, to order a consultative examination in light of Plaintiff's declining physical condition in the year prior to the hearing.

"Because a hearing before an ALJ is not an adversary proceeding, the ALJ has a basic obligation to develop a full and fair record." *Graham v. Apfel,* 129 F.3d 1420, 1422 (11th Cir.1997). Accordingly, the ALJ must probe into all relevant facts, even where a claimant is represented by counsel. *Cowart v. Schweiker,* 662 F.2d 731, 735 (11th Cir. 1981). While the ALJ is bound to make every reasonable effort to obtain from the claimant's treating physicians all the medical evidence necessary to make a determination, 20 C.F.R. § 404.1512(d), the burden is nonetheless on the claimant to prove that she is disabled. The Social Security Regulations provide in part:

> In general, you have to prove to us that you are blind or disabled. Therefore, you must bring to our attention everything that shows that you are blind or disabled. This means you must furnish medical and other evidence that we can use to reach conclusions about your impairment(s) and, if material to the determination of whether you are blind or disabled, its effect on your ability to work on a sustained basis.

20 C.F.R. § 404.1512(a). Additionally, "[i]n fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision." *Ford v. Sec'y of Health and Human Servs.*, 659 F.2d 66, 69 (11th Cir. 1981); *Holladay v. Bowen,* 848 F.2d 1206, 1210 (11th Cir. 1988).

Upon review of the record, the Court finds Plaintiff's argument to be without merit. In determining Plaintiff's RFC, the ALJ gave significant weight to the opinion of Dr. Thurman Gillespy, Jr., an orthopedist who treated Plaintiff from October 2007 to April 2008 for neck and back pain. On April 21, 2008, Dr. Gillespy stated Plaintiff was capable of "full time, light duty work with lifting limited to twenty (20) pounds," and could not do computer work for more than twenty to thirty minutes at a time (Tr. 454). Dr. Gillespy noted Plaintiff's subjective complaints did not match with objective findings. *Id.* The ALJ incorporated the limitations assessed by Dr. Gillespy into the RFC. The ALJ also gave "some weight" to the medical opinions of two state agency consultants who completed Physical RFC Assessments in June 2007 and November 2007 and concluded Plaintiff was capable of a range of light exertional work activity (Tr. 30-31).

Plaintiff argues the ALJ erred in heavily relying on Dr. Gillespy's opinion, because Dr. Baldassarri's records dated September 2008 through July 2009 show Dr. Baldassarri was treating Plaintiff for increasing pain. Plaintiff argues this evidence shows a decline in Plaintiff's condition warranting an updated medical assessment.

The undersigned finds the ALJ did not err by failing to recontact Dr. Baldassarri or to order an updated consultative examination, because the record does not establish that such an examination was necessary to enable the ALJ to render an informed decision. It is clear from his opinion that the ALJ considered Dr. Baldassarri's treatment records that were subsequent to Dr. Gillespy's opinion. The ALJ noted Plaintiff was treated by Dr. Baldassarri in 2008 and 2009 for complaints of chronic neck pain with significant muscle spasm, but noted she "was seen infrequently, with only 3 documented office visits between May 2008 and July 2009" and otherwise called regularly for medication refills (Tr. 30). The

ALJ noted Plaintiff was treated by Dr. Baldassarri for a substantial period of time, and he had made no significant change to her pain control regime despite complaints of severe pain, which suggested a level of satisfaction with the treatment results (Tr. 31). The ALJ also noted the record did not document a progression in the claimant's condition requiring more aggressive treatment. *Id.*

Furthermore, the record simply does not reflect a decline in Plaintiff's condition to the extent argued by Plaintiff. As noted by the ALJ, the record only reflects two visits with Dr. Baldassarri due to Plaintiff's complaints of pain between September 2008 and July 2009. On September 17, 2008 Plaintiff reported to Dr. Baldassarri that she was having increasing pain (Tr. 449). Dr. Baldassari noted Plaintiff had a history of chronic neck pain and she reported the intensity had been increasing lately. *Id.* Dr. Baldassarri observed Plaintiff's neck revealed spasms and pain throughout range of motion. *Id.* Dr. Baldassarri prescribed Baclofen and Celebrex. *Id.* Plaintiff also reported she was having symptoms of lumbar pain, fever and chills for the last week; she reported experiencing similar symptoms two months prior and was diagnosed with pyelonephritis.[10] *Id.* Dr. Baldassarri noted Plaintiff had tenderness to palpatation of the costovertebral angle bilaterally, assessed mild pyelonephritis, prescribed Cipro, and advised Plaintiff to drink plenty of fluids. *Id.* On January 17, 2009, Plaintiff reported to Dr. Baldassarri that her neck had been hurting more and she was unable to tolerate the Baclofen due to nausea (Tr. 445). Examination revealed "a lot of spasms and pain diffusely through the neck and upper back."

---

[10] Pyelonephritis is an "inflammation of the renal parenchyma, calyces, and pelvis, particularly due to local bacterial infection." *See* MediLexicon, http://www.medilexicon.com/medical dictionary.php (last visited March 26, 2012).

*Id.* Examination also revealed tenderness in the epigastric area left upper quadrant, but no guarding, masses, or rebound tenderness. *Id.* Dr. Baldassarri assessed gastritis[11] and prescribed Omeprazole. *Id.* Dr. Baldassarri also assessed neck pain and prescribed Soma and Diclofenac, in addition to Lortab. *Id.* Dr. Baldassarri noted that if Plaintiff was unable to tolerate the medication and the pain kept getting worse, "pain management evaluation with possible local injections" would be the next step. *Id.* However, there is no indication such treatment ever occurred or was found necessary. Thus, other than Plaintiff's subjective complaints of increased pain on two occasions, the record does not contain any evidence from Dr. Baldassarri that Plaintiff's condition had substantially changed or declined.

The additional evidence submitted by Plaintiff to the Appeals Council supports the conclusion that the ALJ did not err in failing to perform further factfinding. After the ALJ issued his decision, Dr. Baldassarri submitted a report dated April 5, 2010 stating he was treating Plaintiff for chronic cervical spinal pain; cervical post-laminectomy syndrome (C5-6); and degenerative disc disease of the cervical spine (Tr. 529). Dr. Baldassarri reported he was treating these conditions with narcotic analgesics and muscle relaxants, which were "marginally effective." *Id.* Dr. Baldassarri stated the long term goal of Plaintiff's treatment was "pain control." *Id.* Dr. Baldassarri responded to the question "What, if any, signs and symptoms does this patient demonstrate that would interfere with job performance and/or attendance?" with "constant pain and the need for constant narcotic use for its control." *Id.* The Appeals Council considered this report when denying Plaintiff's request for review (Tr.

---

[11] Gastritis is "inflammation, especially mucosal, of the stomach." *See* MediLexicon, http://www.medilexicon.com/medical dictionary.php (last visited March 26, 2012).

4). There is nothing in Dr. Baldassarri's report that contradicts the evidence relied upon by the ALJ. Thus, Plaintiff has not shown that she suffered prejudice as a result of any failure of the ALJ to contact Dr. Baldassarri for an updated assessment, because there is no evidence that the ALJ's decision would have changed in light of any additional information from Dr. Baldassarri. *See Robinson v. Astrue*, 365 Fed. Appx. 993, 999 (11th Cir. 2010) (finding no error where plaintiff did not show prejudice from ALJ's failure to request additional consultative examination or to recontact treating physicians). Accordingly, the Court concludes the ALJ did not err by failing to recontact Dr. Baldassarri or to order an updated consultative examination, because the record does not establish that such an examination was necessary to enable the ALJ to render an informed decision. *See Ford*, 659 F.2d at 69; *Holladay,* 848 F.2d at 1210.

## VI. Conclusion

Accordingly, the decision of the Commissioner shall be **REVERSED** pursuant to sentence four of 42 U.S.C. § 405(g). The case is **REMANDED** for additional proceedings consistent with this Order and Opinion. On remand, the ALJ shall reopen the record and accept any additional evidence deemed appropriate. The Clerk of Court is directed to enter judgment consistent with this Order and Opinion, and thereafter to close the file.[12]

---

[12] If Plaintiff were to ultimately prevail in this case upon remand to the Social Security Administration, any motion for attorney fees under 42 U.S.C. § 406(b) **must be filed within thirty (30) days** of the Commissioner's final decision to award benefits. *See Bergen v. Comm'r Soc. Sec.*, 454 F.3d 1273, 1278 n.2 (11th Cir. 2006) (recognizing under Fed. R. Civ. P. 54(d)(2)(B) the district court may enlarge the time for any attorney to petition for fees and suggesting time be stated in the judgment); *compare with* Fed. R. Civ. P. 54(d)(2)(B) and M.D. Fla. Loc. R. 4.18(a) (both requiring that unless a statute **or court order** provides otherwise, any motion for attorney fees must be filed no later than fourteen (14) days after entry of judgment) (emphasis added). This Order and Opinion does not, however, extend (continued...)

Plaintiff is cautioned, however, that this opinion does not suggest Plaintiff is entitled to disability benefits. Rather, it speaks only to the process the ALJ must engage in and the findings and analysis the ALJ must make before determining whether Plaintiff is disabled within the meaning of the Social Security Act. *Phillips v. Barnhart*, 357 F.3d 1232, 1244 (11th Cir. 2004).

**DONE AND ORDERED** at Jacksonville, Florida, this 27th day of March, 2012.

*Thomas E. Morris*

**THOMAS E. MORRIS**
United States Magistrate Judge

Copies to: All counsel of record

---

[12](...continued)
the time limits for filing a motion for attorney fees under the Equal Access to Justice Act.